William G. Moore v. Commissioner.
Moore v. Commissioner
Docket No. 1448.
United States Tax Court
1944 Tax Ct. Memo LEXIS 268; 3 T.C.M. (CCH) 414; T.C.M. (RIA) 44140; May 3, 1944
*268 Bryan C. S. Elliott, Esq., 1871 Frick Bldg. Annex, Pittsburgh, Pa., for the petitioner. J. Harrison Miller, Esq., for the respondent. SMITH Memorandum Findings of Fact and Opinion SMITH, Judge: The respondent has determined a deficiency in petitioner's income tax for 1939 in the amount of $1,802.60. The only question in issue is whether petitioner is entitled to a bad debt deduction of $30,080.78 or some part thereof in 1939. Findings of Fact The petitioner is a resident of Sewickley, Pa., and filed his income tax return for the calendar year 1939 with the collector of internal revenue at Pittsburgh, Pa.
In September, 1926, the petitioner made a loan of $50,000 to two brothers, Anthony P. and Charles J. Jim who operated a chain of motion picture theatres in western Pennsylvania. He engaged an attorney, Roy Rose, of Pittsburgh, to look after the details of the transaction and to arrange for proper collateral. Under Rose's direction a new corporation was formed under the name of Ohio Valley Amusement Co., hereinafter referred to as Ohio, to which the Jim brothers transferred some of their theatre properties. All of Ohio's capital stock, consisting of 500 shares, were issued to petitioner *269 as collateral on his loan. As additional collateral petitioner was given a second mortgage on one of the real estate properties owned by Ohio and an insurance policy for $25,000 on the life of Anthony P. Jim. In 1929 petitioner released his second mortgage collateral so that the mortgaged property might be sold by Ohio and in lieu thereof was given a "judgment bond" in the amount of $60,750 executed by both of the Jim brothers and by Ohio,and also a trust deed to certain Pittsburgh real estate owned by the Jim brothers. The amount of the judgment bond, $60,750, was said to comprise the $50,000 debt due petitioner and "the salary due him as Secretary of the OhioValley Amusement Company in the amount of Three Hundred Seventyfive ($375.00) Dollars per month, starting with May 1, 1929, and ending September 1, 1931." Thereafter, and prior to 1933, the Jim brothers requested petitioner to release his trust deed on the Pittsburgh real estate so that they might mortgage the property to raise funds for trading in securities. Petitioner did so and later in the same year the property was foreclosed and taken over by the mortgagee. In 1931 Anthony P. Jim executed an instrument, under seal, *270 dated March 25, 1931, by which he purported to "grant, bargain, sell, release, confirm and deliver over" to petitioner all of his capital stock of the Ohio, consisting of 400 shares, "TO HAVE AND TO HOLD * * * unto the said W. G. Moore, his heirs, executors, administrators and assigns to and for his own use, benefit and behoof forever." The instrument further provided: "THAT - WHEREAS, on or about May 29, 1929 Anthony P. Jim and Charles J. Jim duly executed their judgment bond to said W. G. Moore in the sum of Sixty Thousand Seven Hundred Fifty ($60,750.00) Dollars for money had and received and inter alia as collateral security for the payment of said indebtedness to W. G. Moore in accordance with its terms placed in the hands of said W. G. Moore certain Certificates of the common capital stock of the Ohio Valley Amusement Company owned by and standing in the name of Anthony P. Jim and hereinafter more fully set forth; and "WHEREAS, default has been made in the payment of said bond, in accordance with its terms and it is the desire of the parties hereto to have said stock transferred to said W. G. Moore free and clear of any right, title, interest or equity of redemption or interest *271 of any kind whatsoever of said Anthony P. Jim in and to the said shares of stock." During 1933 Anthony P. Jim, who was manager of the Jim brothers' properties, was adjudicated a bankrupt. In the petition which he filed with the District Court of the United States for the Western District of Pennsylvania there was listed among his liabilities as an indebtedness to petitioner "judgment bond for loan and salary contract - $85,000.00." The stock of Ohio was not listed among the bankrupt's assets. Petitioner did not file any claim and did not receive anything in distribution in the bankruptcy proceeding. The bankrupt was discharged on January 22, 1938. Ohio's operations did not prove successful and, in 1933, under a plan proposed by petitioner's attorney, Rose, an agreement was entered into by petitioner and others whereby the operation of Ohio's properties was turned over to a rival corporation, Indiana County Theatres Company, hereinafter referred to as Indiana. Pursuant to that agreement petitioner transferred 300 shares of Ohio's stock to Indiana. During 1933 petitioner agreed to pay to Rose as compensation for his services in connection with the above described matters 25 percent *272 of whatever amount should finally be recovered on the Jim brothers' indebtedness. In 1935 all of the theatre properties owned by Ohio were transferred to a new corporation, Latrobe Theatres, Inc., hereinafter referred to as Latrobe, and the stock of that corporation was issued to petitioner and to Indiana in the same proportion as their stockholdings in Ohio. Under date of August 24, 1936, the petitioner entered into an agreement with Michael Manos under which the petitioner exchanged the collateral theretofore held by him for new collateral consisting of one-tenth of the shares of stock of Indiana, restricted, however, as to assignability, and granting certain options to petitioner and Manos. The agreement gave Manos an option to purchase petitioner's one-tenth stock interest in Indiana upon the following terms and conditions. "2. At any time within three (3) years from and after the incorporation and organization of the proposed new company, the party of the second part [Manos] agrees that he will purchase the one-tenth (1/10) stock inetrest therein of the party of the first part [petitioner] at and for the price of TWENTY THOUSAND ($20,000.00) DOLLARS, provided the operations *273 of such new company show a net operating profit, and pay unto the party of the first part the consideration as aforesaid, upon the delivery to him of the certificates representing such shares of stock within ten (10) days after he shall have received from the party of the first part notice of his desire to sell. "3. The party of the first part hereby grants unto the party of the second part the option or privilege of purchasing his one-tenth (1/10) interest in the shares of stock of such new company at any time within ninety (90) days after the expiration of three years from and after the incorporation and organization of such new company at the sum of TWENTY THOUSAND ($20,000.00) DOLLARS plus one-tenth (1/10) of the surplus or undivided profits as shown by the books of said new company at the time of such purchase, in the event the party of the first part shall not have, within such preceding three (3) year period, offered such shares for sale to the party of the first part in accordance with paragraph 2 hereof. "4. The party of the first part agrees that he will not, within three (3) years and ninety (90) days from and after the organization of such new company, offer his shares *274 for sale nor cause his shares in such new company to be assigned, except to the party of the second part, and that, after the expiration of such period of three (3) years and ninety (90) days, within which he has the right hereunder to require the party of the second part to purchase, and/or the party of the second part has an option to purchase as aforesaid, he will not sell nor assign his shares of stock, or any part of them, without first offering such shares for sale to the said party of the second part at a price equal to that which he can obtain for such shares from others." The above agreement further provided that in lieu of organizing a new corporation the parties might utilize the existing corporation, Indiana, for the purposes therein set forth. Pursuant to the agreement of August 24, 1936, 100 shares of Indiana's capital stock were issued to petitioner on September 8, 1936. Thereafter, petitioner received dividends on the stock of Indiana of $2,500 in 1936, $2,500 in 1937, and $1,250 in 1938. In August, 1939, Manos exercised his option under the agreement of August 24, 1936, and purchased petitioner's Indiana stock for $26,543.98. Petitioner reported as dividend income *275 in his return for 1936 $1,875 of the $2,500 of dividends which he received on his Indiana stock in that year. He omitted the 25 percent payable to Rose. He did not report in his returns for 1937 and 1938 the dividends received in those years. In his 1939 return he reported a net capital loss on the sale of his shares of Indiana capital stock of $13,500, which he computed as follows: Purchase price Mar. 15, 1927
$50,000.00.lDividend recd. 12/10/37
$ 2,500.00
Dividend recd. 12/21/38
1,250.00
Sale price recd.
26,543.98
Total receipts
$30,293.98
30,293.98
Loss
$19,706.02
Add (25% of receipts paid to atty.
Rose)
7,573.50
Total long-term capital loss
$27,279.52
Deducted in return (1/2 thereof)
13,639.76
The respondent determined in his deficiency notice that petitioner realized a long-term capital gain on the sale of the Indiana stock of $2,720.48. He treated the stock as having been acquired by petitioner under the agreement of August 24, 1936, and as having cost $20,000 which he determined was its fair market value at the time of acquisition. Pursuant to his agreement with Rose the petitioner paid him 25 percent of each dividend received from Indiana and *276 25 percent of the amount received from Manos in 1939, or a total payment to Rose in 1939 of $6,635.99. Opinion The only error alleged in the petition under paragraph 4 is that: In determining the tax liability of the Petitioner for the year 1939, the Commissioner in computing a long-term capital gain of $2,720.48 upon the disposition of capital stock in Indiana County Theatres Company, Inc., erroneously held that "this stock was acquired in a taxable exchange on August 24, 1936, at which time the fair market value was $20,000.00" whereas the said stock was acquired in a non-taxable exchange of collateral for a debt in the principal amount of $50,000.00 with accrued interest, due to Petitioner from one A. P. Jim, and furthermore the value of said stock was in excess of $60,000.00. Petitioner alleges as a fact under paragraph 5 (k) of this petition: That on July 14, 1939, all of the collateral to the debt of A. P. Jim due Petitioner having been disposed of and said A. P. Jim having been discharged in Bankruptcy previously thereto, Taxpayer sustained a deductible loss on account of a bad debt in the amount of $30,080.78. The petitioner's contention that he is is entitled to a *277 bad debt deduction for 1939 depends upon whether the debt became worthless in that year. Section 23 (k) I.R.C., as amended by section 124 of the Revenue Act of 1942. The evidence shows that prior to 1939 the debt of the Jim brothers to the petitioner was worthless except as to the amount which could be realized by the petitioner on collateral held on the debt. In other words, the collateral had been substituted for the debt. The collateral consisting of 100 shares of Indiana stock was received by the petitioner in 1936. The respondent contends that its fair market value at the date of receipt was $20,000. There is no evidence from which we can determine that the value was in excess of that amount. The respondent contends that upon the sale of the collateral the petitioner realized a long-term capital gain of $2,720.48. The evidence does not show any error in the respondent's determination. Decision will be entered for the respondent.